# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAMES SHEWMAKE,            )
                          )  No. 12 CV 6339
                Plaintiff, )
                          )
    v.                     )  Magistrate Judge Young B. Kim
                          )
CAROLYN W. COLVIN, Acting  )
Commissioner, Social Security )
Administration,[1]          )
                          )  June 12, 2014
                Defendant. )

## MEMORANDUM OPINION and ORDER

James Shewmake seeks disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, claiming that he is unable to work because of his diabetes, Crohn's disease, Hepatitis C, and anxiety. After the Commissioner of the Social Security Administration denied his application, Shewmake filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Shewmake's motion is granted to the extent that the case is remanded for further proceedings and the Commissioner's motion is denied:

### Procedural History

Shewmake applied for DIB on May 12, 2010, claiming he became unable to work as of June 1, 2009. (Administrative Record ("A.R.") 35.) After his claims were

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

denied initially and upon reconsideration, (id. at 108, 122), Shewmake sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 137-38). The ALJ held a hearing on September 27, 2011, at which Shewmake and a vocational expert provided testimony. (Id. at 54.) On November 7, 2011, the ALJ issued a decision finding that Shewmake is not disabled within the meaning of the Social Security Act and denying his DIB claim. (Id. at 32-51.) When the Appeals Council denied Shewmake's request for review, (id. at 1-4), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On August 10, 2012, Shewmake filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g); (R. 3). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c); (R. 8).

## Facts

Shewmake contracted Hepatitis C while serving in the Navy over 20 years ago, (A.R. 465), was diagnosed with diabetes more than 10 years ago, (id. at 57), and has suffered from anxiety disorder since at least July 2009, (id.). He was also diagnosed with Crohn's disease during the summer of 2009. (Id. at 359.) A high school graduate, Shewmake was a construction worker for nearly 20 years until he was let go from his job in November 2008. (Id. at 248, 268, 332.) He was 44 years old when he stopped working, is currently unemployed, and lives with his wife and their two children. (Id. at 60-61.) Shewmake presented both documentary and testimonial evidence in support of his claim.

## A. Medical Evidence – Physical Health

The relevant medical record begins in July 2009 when Shewmake sought treatment at Primary Care Joliet ("PCJ"). (A.R. 468.) Shewmake initially was seen by Laura Neilsen, a physician's assistant, and during later visits was treated by Linda Hushaw, a nurse practitioner ("NP"). (See, e.g., id. at 457, 585.) Dr. Yatin Shah, an internal medicine doctor at PCJ, sometimes co-signed Shewmake's medical notes. (See, e.g., id.) When Shewmake visited PCJ in July 2009, he reported having severe and frequent diarrhea ever since going on a camping trip a couple weeks earlier. (Id. at 352.) He was given antidiarrheal medications, (id.), but ended up in the emergency room at Provena Saint Joseph Medical Center a week later with bloody diarrhea and renal failure, (id. at 349). At that time he reported having four bowel movements a day, abdominal cramping, and weight loss of 32 pounds over the previous two weeks. (Id. at 353.) A colonoscopy and biopsy confirmed that Shewmake had pancolitis (a severe form of ulcerative colitis) and Crohn's disease. (Id. at 359.)

During a follow-up visit to PCJ in early August 2009, Shewmake reported that his diarrhea had ceased. (Id. at 465.) However, during subsequent visits in October and November 2009, he reported having diarrhea again and was referred to a gastroenterologist. (Id. at 457, 461.) In December 2009 and February 2010, Shewmake saw Dr. Kamran Ayub at Southwest Gastroenterology, who recommended an inflammatory bowel disease ("IBD") panel and capsule

enterography testing. (Id. at 396-97.) The capsule endoscopy report noted "[f]ew small erosions only." (Id. at 392.)

Meanwhile Shewmake continued to visit PCJ from January through June 2010 on a monthly basis. Shewmake complained of diarrhea, fatigue, and weight loss from January to April 2010. (Id. at 443, 446, 449, 453.) During an April 2010 visit NP Hushaw noted that Shewmake experienced a recent flare-up in his ulcerative colitis symptoms after eating peanuts and deviled eggs, and that he ate pancakes with syrup and sweetened iced tea the day of his visit. (Id. at 442-44.) NP Hushaw recommended that he aim to exercise for 30 minutes three to five days per week, and that he cut back on sodium, fast food, and foods high in protein. (Id. at 444.)

Shewmake went to the emergency room at Silver Cross Hospital in May 2010 complaining of persistent diarrhea. (Id. at 404.) He was given steroids, which improved his symptoms, and was discharged in stable condition. (Id.) But he continued to report diarrhea, fatigue, and weight loss through June 2010, and NP Hushaw again recommended that he stick to a healthy diet and cut back on foods high in calories, fat, and sugar. (Id. at 429, 432, 436.) Shewmake went back to PCJ for a follow-up visit in August 2010, during which he reported having recently gone swimming in a lake. (Id. at 590.) He also complained of diarrhea, fatigue, and weight loss. (Id. at 591.)

Later that August, Dr. Sarat Yalamanchili conducted a 40-minute examination of Shewmake at the request of the Illinois Bureau of Disability

Determination Services ("DDS"). (Id. at 537-40.) Dr. Yalamanchili noted that Shewmake had a history of diarrhea from Crohn's disease as well as a history of Hepatitis C and poorly controlled blood-sugar levels. (Id. at 538, 540.) He observed that Shewmake was in no acute distress, his abdomen was "soft, nontender without organomegaly [abnormal enlargement] or masses palpable[,]" and his bowel sounds were "normoactive." (Id.) Dr. Yalamanchili noted that Shewmake had some difficulty with squatting and arising, and that his symptoms included "inability to work because of his recurrent diarrhea." (Id. at 539-40.) A few days later in September 2010, Shewmake saw Dr. Mary DeGroot, a podiatrist at DeGroot Foot and Ankle Clinic, for diabetic foot care and reported having gone on a "pretty rugged" camping trip which left two of his toenails discolored. (Id. at 507.)

Later that September, Dr. Francis Vincent, a medical consultant, completed a Physical Residual Functional Capacity ("RFC") Assessment. (Id. at 529-36.) He opined that Shewmake could lift 20 pounds occasionally and 10 pounds frequently, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and perform unlimited pushing and pulling. (Id. at 530.) Dr. Vincent noted that Shewmake could frequently climb ramps or stairs and balance, but because of low-back pain could only occasionally climb ladders, ropes, or scaffolds, stoop, kneel, crouch, and crawl. (Id. at 531.) Dr. Vincent concluded that Shewmake had no manipulative, visual, communicative, or environmental limitations, except that he should avoid concentrated exposure to hazards. (Id. at 532-33.) He believed Shewmake's statements were only "partially credible in light

of the overall evidence" and that his claimed limitations "exceed[ed] that supported by the objective medical findings[.]" (Id. at 536.)

From September 2010 through September 2011, Shewmake continued to make monthly visits to PCJ and had several appointments with various specialists. During a September 2010 visit to PCJ he reported no exacerbations in Crohn's symptoms and denied having diarrhea. (Id. at 716-17.) Then in October 2010, Shewmake saw Dr. Ayub for a Crohn's flare-up and reported having diarrhea five to ten times per day. (Id. at 556.) Dr. Ayub wrote a note stating that Shewmake "at times requires frequent episodes to [the] bathroom" and recommended that he get a colonoscopy. (Id. at 550, 557.) The next day Shewmake again went to the emergency room at Silver Cross Hospital complaining of abdominal pain. (Id. at 565.) He also reported that he was constipated. (Id. at 567.) X-rays showed large amounts of retained fecal debris, but without any evidence of bowel obstruction. (Id. at 565.)

The following week in October 2010, Shewmake visited PCJ and NP Hushaw noted that Shewmake wanted a "second opinion since he does not want to have recommended surgery[,]" presumably to address his Crohn's. (Id. at 583-84.) NP Hushaw's notes contain no mention of diarrhea for that day, or for his following appointment on November 15, 2010. (See id. at 583-85.) On November 16, 2010, Shewmake had a colonoscopy and was treated by Dr. Nikhil Bhargava, a gastroenterologist, on November 29, 2010. (Id. at 619-21.) The colonoscopy showed active proctitis, or inflammation of the rectum's lining, and extraintestinal

manifestations of IBD. (Id. at 622.) Dr. Bhargava noted that Shewmake was experiencing "approximately 3 to 10 bowel movements per day" and had "three flares in the last two years[.]" (Id. at 621.) He also reported that Shewmake was drinking two to three cups of iced tea per day. (Id.) Dr. Bhargava observed that Shewmake's abdomen was non-tender and non-distended, and that his bowel sounds were positive. (Id.)

From December 2010 through April 2011, Shewmake denied having or made no mention of diarrhea during his visits to PCJ. (Id. at 695, 697, 701, 704, 707.) In that time period Shewmake was examined further by state consultants and his own medical providers. In January 2011, Dr. David Mack completed an Illinois Request for Medical Advice form affirming Dr. Vincent's September 2010 Physical RFC Assessment. (Id. at 623-25.) According to the form, Shewmake alleged his condition had worsened since the initial assessment in that his bowel movements and abdominal cramps became more frequent. (Id. at 625.) After listing the additional records he considered on review, Dr. Mack concluded that Shewmake's claims were still only "partially credible" and that "objective medical evidence" did not support the severity of his statements. (Id.)

In a February 2011 letter, Dr. Bhargava wrote that Shewmake was "still having three to five bowel movements per day" but denied having weight loss. (Id. at 673.) A physical examination revealed no acute distress and a non-tender, non-distended abdomen with positive bowel sounds. (Id.) Shewmake's labs showed his small bowel follow-through was "unremarkable." (Id.) Dr. Bhargava noted that

Shewmake's diarrhea could be the result of Crohn's exacerbation, irritable bowel syndrome ("IBS"), or narcotic-related bowel issues. (Id.)

In March 2011, NP Hushaw completed a Functional Capacity Questionnaire and a Medical Source Statement ("MSS") in which she stated that Shewmake suffers from "recurrent/persistent diarrhea," abdominal pain, weight loss, and bowel incontinence. (Id. at 627.) She opined that he could sit for three hours and stand or walk for three hours in an eight-hour workday, (id. at 633), but that he could only sit for 30 minutes at a time and stand for 15 minutes at a time in a competitive work situation, (id. at 628). She stated that he was "[i]ncapable of even low stress jobs" because of frequent flare-ups and hospitalization and that his pain would frequently be severe enough to interfere with the attention and concentration needed to perform simple work tasks. (Id. at 628, 633.) NP Hushaw opined that Shewmake would need to take eight unscheduled breaks throughout the day because of pain, fatigue, and diarrhea, and could not work an eight-hour workday. (Id. at 629.) She further concluded that he would miss more than four days of work per month because of his impairments. (Id. at 630.)

Later in March 2011, Dr. Bhargava performed another colonoscopy on Shewmake and noted symptoms of Crohn's disease and pseudopolyps, but he found ulcerative colitis "very unlikely." (Id. at 667.) He noted that Shewmake had three to four non-bloody bowel movements per day, and that his abdominal pain was "reasonably well controlled." (Id. at 672.) He observed that Shewmake's abdomen

was non-tender, non-distended, and produced positive bowel sounds. (Id.) Dr. Bhargava suspected Shewmake might have IBS along with IBD. (Id.)

In May 2011 Shewmake complained of diarrhea and abdominal pain during a visit to PCJ, (id. at 692), but in the months that followed his symptoms appeared to lessen or become milder. In June 2011, Dr. Bhargava wrote a letter reporting that Shewmake had three to five non-bloody bowel movements per day. (Id. at 671.) Dr. Bhargava observed that Shewmake's abdomen appeared normal and concluded that his Crohn's disease had only "mild symptoms." (Id.) Shewmake denied or made no mention of having diarrhea in June and July 2011 visits to PCJ. (Id. at 685, 689.) Dr. Nancy Reau, a gastroenterologist in Dr. Bhargava's group, wrote in a July 2011 letter that Shewmake's Crohn's disease was "quiescent." (Id. at 758.) Dr. Wassim Harake, an endocrinologist, reported in July 2011 and August 2011 that diarrhea was "not present" when reviewing Shewmake's gastrointestinal system. (Id. at 776, 779.)

Shewmake also denied or made no mention of having diarrhea during August and September 2011 visits to PCJ and reported both times that he exercises two to three times per week. (Id. at 679, 683.) In August 2011, Dr. Bhargava wrote that Shewmake had three to five "well-formed bowel movements." (Id. at 756.) Dr. Bhargava also suspected that Shewmake's Crohn's disease was "secondary to diabetes," and that his frequent bowel movements were actually due to diabetes because "endoscopically he appeared mild to moderate." (Id.)

In September 2011, Dr. Shah signed an MSS stating that Shewmake could only sit and stand or walk for less than two hours a day. (Id. at 766.) He concluded that Shewmake was capable of tolerating only a low level of work stress because his "diarrhea causes anxiety and pain," and that a higher level of stress "would exacerbate these symptoms." (Id. at 767.) According to Dr. Shah, Shewmake would miss work more than three times per month. (Id. at 768.)

## B. Medical Evidence – Mental Health

Shewmake has never sought psychiatric treatment, but records from PCJ note he has a history of anxiety. (See, e.g., A.R. 432, 465, 471, 717.) During many visits NP Hushaw indicated Shewmake had decreased concentration or a depressed mood. (See, e.g., id. at 429, 436, 454.) NP Hushaw also wrote on several occasions that medications such as Xanax and Ativan provided adequate relief for his chronic stress and anxiety. (Id. at 449, 678, 683, 686, 689, 701, 704.)

In August 2010, Dr. Erwin Baukus completed a Psychological Mental Status Examination of Shewmake on behalf of DDS. (Id. at 544-48.) During the examination Shewmake reported, among other symptoms, decreased energy, difficulty concentrating and thinking, and generalized persistent anxiety. (Id. at 546.) Dr. Baukus noted that Shewmake independently takes care of daily activities like "toileting, washing, shaving, and personal hygiene needs[,]" and watches his children when he is not hospitalized. (Id.) He drives and takes care of light chores at home, but his wife does the grocery shopping. (Id.) Dr. Baukus observed that Shewmake maintained appropriate social behavior during the examination, but

that his mood was mildly depressed. (Id. at 546-47.) Dr. Baukus ultimately diagnosed him with "Mood Disorder Due to Multiple General Medical Conditions." (Id. at 548.)

In September 2010, Dr. Kirk Boyenga completed a Psychiatric Review Technique and a Mental RFC Assessment in which he noted a diagnosis of affective disorder and generalized anxiety disorder. (Id. at 518, 520.) He found that Shewmake had no significant limitations on understanding and memory and was moderately limited in his ability to maintain attention and concentration for extended periods of time. (Id. at 511.) He also found that Shewmake was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 512.)

In his functional capacity assessment, Dr. Boyenga reported that Shewmake was free of thought disorder or serious memory problems during the examination and that he had mild limitations in activities of daily living. (Id. at 512, 525.) Dr. Boyenga noted that Shewmake could perform simple tasks, and demonstrated no serious limitation of social skills. (Id. at 512.) He opined that Shewmake could follow directions despite limitations in adaptation abilities and found no evidence of decompensation. (Id. at 512, 525.) Dr. Boyenga further concluded that Shewmake's statements were "partially credible in light of the overall evidence" and that his

claimed restrictions exceeded "that supported by the objective medical findings[.]" (Id. at 527.)

In January 2011, Dr. Russell Taylor completed an Illinois Request for Medical Advice form affirming Dr. Boyenga's September 2010 Psychiatric Review Technique and Mental RFC Assessment. (Id. at 623-25.) According to the form, Shewmake alleged his condition had worsened since the initial assessment in that his bowel movements and abdominal cramps became more frequent. (Id. at 625.) Dr. Taylor concluded that the "medical evidence obtained at the reconsideration level supports the findings of the initial decision." (Id.) He also noted that Shewmake's claims were only "partially credible" and that "objective medical evidence" did not support the severity of his statements. (Id.)

In March 2011, NP Hushaw completed a Functional Capacity Questionnaire and MSS in which she stated that in addition to physical impairments, Shewmake also suffers from depression and anxiety. (Id. at 628, 633.) She noted that he has difficulty concentrating and that during a typical workday, he would frequently experience symptoms severe enough to interfere with the attention and concentration needed to perform even simple tasks. (Id. at 627-28.)

## C. Shewmake's Testimony

During the hearing on September 27, 2011, Shewmake described his past occupation as a construction worker. (A.R. 57.) He testified that he was a union laborer for approximately 21 years, but eventually had to leave his last job because of his Crohn's disease and diabetes. (Id.) He said that although his previous

employer created a "made-up job" for him that involved watching other employees to ensure safety during their use of lifts, he was let go because his frequent trips to the bathroom halted operations and he kept missing days due to his illnesses. (Id. at 57-58, 71.)

Shewmake also testified about the limiting effects of his Crohn's disease, diabetes, and anxiety. He described a good day as having to get up twice in the middle of the night to go to the bathroom and making six trips to the bathroom during the day. (Id. at 79.) He said that on a bad day the pain is so intense it makes him want to vomit, and that he has bad days two to three times a month lasting about three days each time. (Id. at 79-81.) He takes medication on bad days which usually takes 24 to 48 hours to relieve his symptoms, after which he said the symptoms subside but do not completely go away. (Id. at 80.) He reported that the morning of the hearing he took Asacol and Asacol suppositories, Xanax, Lisinopril, and other medications. (Id. at 58-59.) He added that when he is hospitalized during flare-ups of Crohn's symptoms, he is given Prednisone and another intravenous medication. (Id. 59-60.) During "mild flare-ups," he takes Norco. (Id. at 82.)

He testified that his anxiety can worsen his Crohn's flare-ups, and that flare-ups also make his diabetes worse because they increase his insulin levels. (Id. at 73-75.) He discussed the possibility of taking Humira with Dr. Bhargava to address his Crohn's flare-ups, but was told that he had to get his diabetes "under control" first before he could try Humira. (Id. at 72-73.) He said that his blood-sugar level

fluctuated between 60 and 390 during the previous three months, but that it is normally between 250 and 300. (Id. at 71-72.) A couple months before the hearing he began seeing Dr. Harake, who prescribed Januvia for his diabetes. (Id. at 64-65.) Shewmake said that he also visits Dr. DeGroot for diabetic footcare, and that the last time he saw her was in September 2010. (Id. at 70.)

He initially testified that his doctors told him to eat a fiber-free diet with no raw vegetables, raw fruit, or deep-fried, greasy foods. (Id. at 59.) However, upon re-examination by the ALJ, he corrected himself and said that his doctors recommend a high-fiber diet. (Id. at 85.) He denied ever smoking or using any street drugs, and testified that "it's been years" since he last had an alcoholic drink. (Id. at 62.)

He further testified that he has problems sitting because his abdomen swells, which leads to back pain. (Id. at 77-78, 82.) He said that he positions himself on his side in a reclining chair with pillows during the day, but that he cannot sit in that position for too long. (Id. at 78-79.) He explained that he can only stand or walk for 30 minutes before he has to either take medication or sit down to relieve his back pain. (Id. at 82-83.) He also wears an adult diaper when he is more than a short distance away from home because of incontinence, and he indicated that lifting too much or standing up from a crouched position could also cause incontinence. (Id. at 78, 83, 86.)

With respect to daily activities, Shewmake testified that his wife works full-time outside of the home and that they have two children, ages 12 and 9. (Id. at 60.) He usually attends their soccer and baseball games because they live just across the

street from their school. (Id. at 61.) According to Shewmake his wife "pretty much does everything" around the house, including chores and yard work. (Id.) Although he has a driver's license, he stopped driving in recent years because he believes his fluctuating blood-sugar levels make driving unsafe. (Id.) He watches television and does some bird-watching during the day, and his mother visits him at least once a week. (Id. at 63-64.) He said that five years ago he and his wife used to do a variety of outdoor activities such as camping, biking, and fishing, but that they can no longer do those things. (Id. at 76.)

## D.    Vocational Expert's Testimony

Vocational Expert ("VE") Grace Gianforte answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform. (A.R. 88-94.) The VE first confirmed that Shewmake's previous job as a construction worker is a semi-skilled position which he performed at the very heavy level of exertion. (Id. at 90.) The ALJ then asked the VE about a hypothetical individual of Shewmake's age, education, and work experience who could frequently balance and climb ramps and stairs, and occasionally climb ladders, ropes or scaffolds and stoop, kneel, crouch, and crawl. (Id.) This hypothetical individual would need to avoid concentrated exposure to hazards such as moving machinery or unprotected heights, and could perform unskilled work tasks that could be learned by demonstration or in 30 days or less. (Id.) The VE testified that such an individual could work at the light level of exertion as a bench worker, bakery worker, or inspector/packer. (Id. at 90-91.)

The ALJ asked for examples of sedentary positions that would fit the hypothetical, and the VE's response included waxer, hand polisher, and hand painter. (Id. at 91.) The ALJ further limited her hypothetical to unskilled work tasks that would involve occasional decision-making, occasional changes in the work setting, and would not be considered as fast-paced or having strict production quotas. (Id. at 91-92.) The VE responded that these additional limitations would have no effect on her previous response. (Id. at 92.) The ALJ then asked about an individual who could sit for no more than two hours of an eight-hour workday, stand and walk for no more than two hours, and occasionally lift and carry up to 10 pounds, but was unable to stoop, push, pull, kneel, or bend, and would likely miss work more than three times per month. (Id.) The VE testified that such an individual would be unable to sustain competitive employment even if missed work were removed as a limitation. (Id. at 92, 94.)

Finally, the ALJ asked if someone capable of a low stress job could perform the jobs that the VE previously identified, and the VE responded that the individual could. (Id.) The VE further explained that the customary tolerance for unexcused or unscheduled absences in a competitive work environment is 1.3 days per month in the private sector and 1.6 days per month in the public sector. (Id. at 93.) As for rest or break periods, the VE testified that the customary tolerance is anywhere from 10 to 20 minutes during the morning and afternoon, and a mid-shift break of 30 minutes for a seven-hour workday or 45 minutes for an eight-hour workday. (Id.) The VE confirmed that an individual who was likely to exceed those customary

tolerances could not sustain competitive employment. (Id.) When asked by Shewmake's attorney about a hypothetical individual who would be off task 15 percent or more of the day due to lack of concentration, the VE testified that all the jobs she previously listed would be precluded for that individual. (Id. at 94.)

## E.    Post-Hearing Medical Evidence

After the September 2011 hearing before the ALJ, Shewmake visited Dr. Bhargava who reported that Shewmake was having "anywhere between 5-10 bowel movements per day" with "occasional scant rectal bleeding" and some abdominal bloating. (A.R. 785.) Dr. Bhargava noted no acute distress and a normal abdomen upon physical examination. (Id.) He wrote that he suspected Shewmake's diarrhea was related to IBS or diabetes because Shewmake was "endoscopically mild." (Id.) Shewmake also submitted an October 2011 letter from Dr. Shah stating that he supervises NP Hushaw at PCJ. (Id. at 787.)

## F.    The ALJ's Decision

The ALJ concluded that Shewmake is not disabled under sections 216(i) and 223(d) of the Social Security Act. (A.R. 36.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work. *Id.* § 404.1520(f),(g).

Here, the ALJ determined at steps one and two of the analysis that Shewmake has not engaged in substantial gainful activity since June 1, 2009, and that his diabetes, Crohn's disease, Hepatitis C, and depression and anxiety constitute severe impairments. (A.R. 37.) At step three the ALJ determined that since the onset date of disability, Shewmake's impairments or combination of impairments neither meets nor medically equals any of the listings in 20 C.F.R. 404, Subpart P, Appendix 1. (Id. at 37-38.)

Proceeding to the next stage of the analysis, the ALJ concluded that Shewmake has the RFC to perform light work, except that he can frequently balance and climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds and stoop, kneel, crouch, and crawl, and must avoid concentrated exposure to hazards such as moving machinery or unprotected heights. (Id. at 39.) The ALJ also limited him to unskilled work tasks that can be learned by demonstration or in 30 days or less. (Id.) At steps four and five, the ALJ found that Shewmake is

unable to return to his previous work as a construction worker, but that he can perform other jobs that exist in the national economy. (Id. at 44-45.)

## Analysis

In his motion for summary judgment, Shewmake argues that the ALJ committed reversible errors in determining his RFC, weighing the medical evidence, and assessing his credibility. (R. 18, Pl.'s Mem. at 1.) This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## A. Credibility Analysis

The court first addresses Shewmake's credibility argument because the need for remand turns primarily on the deficiencies in the ALJ's credibility assessment. Although Shewmake notes in passing that the ALJ used oft-criticized boilerplate language in her credibility finding, his main contention is that the ALJ failed to

support her finding with sufficient evidence. (See R. 18, Pl.'s Mem. at 14.) Shewmake has a particularly high hurdle to overcome in challenging the ALJ's credibility determination because this court may only overturn an ALJ's credibility assessment if it is "patently wrong." *See Skarbek*, 390 F.3d at 504-05. This court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Shewmake "must do more than point to a different conclusion that the ALJ could have reached." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Put simply, this court will not disturb the ALJ's credibility determination unless it is "unreasonable or unsupported." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The court finds that the ALJ did not adequately support her credibility determination because the reasons she gave for her decision, though several, were each deficient. First, the ALJ wrote that the post-hearing evidence showed no complaints about gastrointestinal symptoms, but she ignored Dr. Bhargava's September 30, 2011 letter noting that Shewmake complained of having five to ten bowel movements per day. (A.R. 42, 785.) The ALJ made another error in concluding that it was "not entirely clear from the record" whether Shewmake "stopped working for medical reasons or other factors." (Id. at 42.) She cited to a letter, presumably from Shewmake's former employer, stating that Shewmake has not worked since November 2008 "due to his health condition." (Id. at 332.) But the ALJ failed to explain how this letter, or any other evidence in the record, led her to conclude that Shewmake may have stopped working because of factors unrelated to

medical reasons. If anything, the letter supports Shewmake's claims that his illnesses prevented him from staying at his previous job.

The ALJ also pointed to the fact that Shewmake went camping and swimming despite allegations of disability. (Id. at 42.) A claimant's statements about his non-work activities can weigh against credibility if those activities are inconsistent with his claimed limitations. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). However, the ALJ did not explain how camping and swimming are inconsistent with Shewmake's claims of recurrent diarrhea. Perhaps the ALJ intended to highlight that Shewmake denied being able to go camping at the hearing, or that he claimed he could only stand and walk for 30 minutes before having to sit, and yet went on a rugged camping trip anyway well after he applied for disability. (See A.R. 42, 76, 82-83, 507.) If so, she should clarify on remand or otherwise explain why she believes his non-work activities are incompatible with his complaints of disability.[2]

Next, the ALJ referred to the fact that Shewmake was instructed to engage in regular exercise. (Id. at 42.) But aside from stating that Shewmake was told to exercise three to five times a week for 30 minutes, the ALJ provided no explanation for why this made his complaints less credible. Perhaps the ALJ intended to note

---

[2] The ALJ should also consider Shewmake's testimony regarding his alcohol, tobacco, and drug use, and address how it bears on his credibility. Shewmake testified at the hearing that he never smoked and that it had been years since the last time he had a drink. (A.R. 62.) He also said he never used any street drugs. (Id.) Yet the record shows that Shewmake admitted to smoking, (see, e.g., id. at 442, 738), tobacco use, (see, e.g., id. at 429, 587, 686), and drinking alcohol socially, (see, e.g., id. at 429, 587, 686), during doctors' visits in 2010 and 2011. And according to Dr. Bhargava, Shewmake has used drugs in the past. (Id. at 621.)

that doing the recommended exercise would be inconsistent with Shewmake's testimony that he cannot lift much weight or stand from a crouched position. (See id. at 78, 83, 86.) Even so, the ALJ did not point to evidence regarding the nature of Shewmake's actual exercise habits. In the absence of further explanation, this court finds that Shewmake's prescribed exercise regimen is an unreliable basis on which to rest a credibility determination. *See Shramek*, 226 F.3d at 813.

The ALJ's reliance on Shewmake's dietary decisions is likewise erroneous, albeit by a narrower margin. She referred to his "failure to comply with his diabetic treatment regimen" and noted that on at least a few occasions, Shewmake deviated from prescribed dietary restrictions. (Id. at 40, 42.) The ALJ did not take the step, however, of finding that adhering to his prescribed diet would improve Shewmake's ability to work. *See Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (ALJ erred in relying on claimant's failure to quit smoking as evidence of non-compliance and as a basis to find her incredible because ALJ made no finding that quitting would restore her ability to work, and no medical evidence directly linked claimant's limitations to smoking). The ALJ connected Shewmake's dietary restrictions to his diabetes treatment and mentioned that one Crohn's flare-up occurred after he ate peanuts and deviled eggs, but she did not cite to medical evidence explaining how following a certain diet would restore or increase his work capacity. (A.R. 40, 42); *see also Rousey v. Heckler*, 771 F.2d 1065, 1070 (7th Cir. 1985) ("None of the medical evidence linked her chest pain directly to the smoking of cigarettes and it was not proper for the ALJ to independently construct that link.").

Finally, the ALJ referred to differences in Shewmake's "complaints to treating doctors" as compared to "those made to his medical providers," concluding that "[o]verall, there is no objective diagnostic support for his symptoms." (A.R. 42.) Not only is it unclear what differences in complaints the ALJ was referring to, the absence of objective medical evidence supporting subjective complaints is only one factor of many to be considered in the credibility determination. *See Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). Given the deficiencies in the ALJ's other reasons for finding Shewmake less credible, in this instance the ALJ's statement that Shewmake's complaints lack objective support is inadequate on its own to prevent remand.

In some cases, the Seventh Circuit has affirmed the ALJ's decision despite the presence of flaws in reasoning when the ALJ's other reasons are valid, *Halsell v. Astrue*, 357 F. Appx. 717, 722 (7th Cir. 2009) ("[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are" (emphasis in original)), or when the evidence supporting the ALJ's decision is overwhelming, *McKinzey v. Astrue*, 641 F.3d 884, 893-94 (7th Cir. 2011). Neither of those situations exists here. The cumulative effect of the errors in the ALJ's credibility determination leave this court "without confidence that the ALJ's decision builds a 'logical bridge' between the evidence and . . . conclusion," *Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009), thus requiring remand.

**B.      RFC Assessment**

**1.      Physical RFC**

Although the court need not address in detail Shewmake's remaining challenges given that remand is necessary on the basis of the ALJ's credibility analysis, the court will address them in the interest of thoroughness.   Shewmake argues that the ALJ failed to account for his diarrhea from Crohn's in determining that he is capable of light work.   (R. 18, Pl.'s Mem. at 8.)   Specifically, Shewmake takes issue with the ALJ's interpretation of "mild" and "quiescent" Crohn's disease in the medical record, arguing that even in its mild form Crohn's can still cause frequent diarrhea and abdominal pain.   (R. 27, Pl.'s Reply at 3.)   He also argues that the ALJ's RFC assessment "did not mention bathroom breaks or off-task time." (See R. 18, Pl.'s Mem. at 9-10.)

Contrary to what Shewmake contends, the ALJ did not overlook his complaints of recurrent diarrhea and abdominal pain, nor did she fail to explain her conclusion that Shewmake is capable of performing light work.   For example,   the ALJ noted that Shewmake reported having diarrhea three to four times a day and between three and ten bowel movements a day on various occasions in 2010 and 2011.   (A.R. 41.)   She also acknowledged that he experienced three Crohn's flare-ups which required hospitalization.   (Id.)   But the ALJ ultimately concluded based on the medical record that Shewmake's Crohn's was not severe enough to justify further RFC limitations.     (See id. at 41.)     She noted that Dr. Bhargava characterized Shewmake's Crohn's disease as "mild" in March and June 2011;

Dr. Reau described it as "quiescent" in August 2011; Dr. Harake noted no diarrhea during an examination that same month; and NP Hushaw recorded no gastrointestinal complaints from Shewmake during several visits to PCJ. (See id. at 41, 43.) The ALJ also found support for her conclusion in Dr. Vincent's report, confirmed by Dr. Mack, which stated that Shewmake is capable of light work with certain postural limitations. (Id. 43.)

In asking whether the ALJ's decision has adequate support, this court will not substitute its own judgment for the ALJ's. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Just because Shewmake disagrees with the ALJ's interpretation of the words "mild" and "quiescent" in the medical record does not mean that the ALJ failed to adequately support her decision. Because the ALJ both confronted contradictory evidence and explained why she rejected it, the court finds no basis for remand in the ALJ's conclusions based on the medical record. *See Thomas v. Colvin*, 534 Fed. Appx. 546, 550 (7th Cir. 2013).

The court reaches a similar conclusion regarding Shewmake's argument that the ALJ's RFC assessment "did not mention bathroom breaks or off-task time." (See R. 18, Pl.'s Mem. at 9-10.) Contrary to what Shewmake alleges, the ALJ did address Dr. Ayub's note that Shewmake "at times requires frequent episodes to the bathroom[.]" (Id. at 10.) As discussed further below, the ALJ stated that the "nature and extent of the treatment record, particularly with regard to the claimant's gastrointestinal conditions," led her to afford less weight to Dr. Ayub's statement. (A.R. 43.) Furthermore, Dr. Ayub's vague note does not explain what

"at times" and "frequent episodes" means, and his other notes do not provide clarification.

Finally, Shewmake points out that the ALJ failed to mention Dr. Yalamanchili's August 2010 note that Shewmake's symptomology included "inability to work because of his recurrent diarrhea." (R. 27, Pl.'s Reply at 4; see A.R. 540.) The ALJ may have disregarded that statement because it was based on Shewmake's subjective reports, which the ALJ found to be less than credible; or perhaps the ALJ was content to rely on Dr. Yalamanchili's note that Shewmake complained of having diarrhea three to four times a day. (See id. at 41.) And although the ALJ did not make this point in her decision, it is the Commissioner who determines whether a claimant is able to work, not his physicians. *See* 20 C.F.R. § 404.1527(e)(1); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). This error alone is insufficient to justify reversing the ALJ's decision, but because the court is already remanding on the basis of the ALJ's credibility finding, the ALJ should explain what weight she gave to Dr. Yalamanchili's note regarding Shewmake's inability to work, and why.

### 2. Mental RFC

Shewmake also argues that the ALJ inadequately accommodated his difficulty concentrating due to mental impairments by limiting him to unskilled work. (R. 18, Pl.'s Mem. at 10-11.) He cites to *O'Connor-Spinner*, 627 F.3d at 620, which rejected the Commissioner's "broad proposition that an ALJ may account generally for moderate limitations on concentration, persistence or pace by

restricting the hypothetical [posed to the VE] to unskilled work." In *O'Connor-Spinner*, the Seventh Circuit explained that when an ALJ does not explicitly mention "concentration, persistence and pace" in her hypothetical, the hypothetical will stand if either of two exceptions applies. First, a court will sometimes assume a VE's familiarity with the claimant's limitations "when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations." *O'Connor-Spinner*, 627 F.3d at 619. Second, a hypothetical will also stand if the ALJ's alternative phrasing specifically excluded tasks that someone with the claimant's limitations would be unable to perform. *Id.*

Regarding the first exception, although the hearing transcript indicates the VE was present during the entire hearing, (A.R. 54-55, 89), the ALJ did not expressly ask whether the VE heard or considered Shewmake's testimony regarding his mental limitations. The VE only testified to reviewing Shewmake's prior work and vocational background with no mention of his medical record. (Id. at 89.) The ALJ also did not mention Shewmake's anxiety or depression in questioning the VE. Furthermore, the court is reluctant to afford latitude where, as here, the ALJ posed "a series of increasingly restrictive hypotheticals to the VE," such that the VE's attention was likely focused on the hypotheticals and not on the record. *See O'Connor-Spinner*, 627 F.3d at 619 (citing *Simila*, 573 F.3d at 521; *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004)). Accordingly, the first exception under *O'Connor-Spinner* does not apply.

Whether the second exception applies is a closer call because it is unclear whether the ALJ sufficiently excluded tasks that Shewmake could not perform because of his mental limitations. This is not a case where the ALJ "described all of [the claimant's] credible impairments, physical and mental" before linking his complaints of pain to the restriction of unskilled work. *See Simila*, 573 F.3d at 521. But the ALJ did restrict her hypotheticals to tasks involving occasional changes in work settings, work environments without "strict production quotas" that are not "fast-paced" or stressful. (A.R. 90-92); *see Murphy v. Astrue*, No. 11 CV 831, 2011 WL 4036136, at *12 (N.D. Ill. Sept. 12, 2011) (ALJ adequately accounted for limitations from anxiety and depression where hypothetical was restricted to jobs without strict quotas that are not fast-paced, are not regarded as very stressful, and only require occasional interaction with people). The Seventh Circuit has acknowledged that "there is uncertainty in the law regarding the formulation of hypothetical questions accounting for mental limitations." *Kusilek v. Barnhart*, 175 Fed. Appx. 68, 71, 2006 WL 925033, *3 (7th Cir. 2006); *see also Dawson v. Colvin*, No. 11 CV 6671, 2014 WL 1392974, at *11 (N.D. Ill. Apr. 10, 2014) (noting that determining whether a hypothetical adequately incorporates mental limitations is no "simple, routine task"). Because the court is remanding for a further discussion of the ALJ's credibility determination, the ALJ should take the opportunity to explicitly address Shewmake's concentration, persistence, and pace limitations with the VE on remand.

## C. Medical Opinions

Shewmake next argues that the ALJ improperly discounted the opinions of NP Hushaw and Drs. Shah and Ayub. (R. 18, Pl.'s Mem. at 12.) Before evaluating whether the ALJ adequately supported her decision to give those sources less weight, the court must first determine each provider's "medical source" category. *See Simila*, 573 F.3d at 514. A "treating source" refers to a claimant's own physician, psychologist, or other acceptable medical source who provides or has provided the claimant with medical treatment or evaluation and who has or had an ongoing treatment relationship with him. 20 C.F.R. § 404.1502. A nontreating source is "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship" with him. *Id*.

If a physician is deemed a "treating source," then the regulations require that the ALJ give his opinions controlling weight, as long as they are supported by medical findings and consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). However, if the physician is deemed a "nontreating source," the ALJ is not required to assign his opinion controlling weight, and instead may evaluate the opinion in light of other factors. *See White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005); *see also* 20 C.F.R. § 404.1527(d)(2)-(6).

Both Drs. Shah and Ayub fall within the definition of nontreating sources. Although Dr. Shah submitted an MSS and a letter stating that he supervises NP Hushaw, it is unclear from the record whether he ever examined or treated

Shewmake himself during any of Shewmake's monthly visits to PCJ. (See A.R. 787.) Furthermore, it appears that Shewmake only sought the MSS and letter from Dr. Shah to obtain support of his claim for disability, which weighs against finding that Dr. Shah is a treating source. *See* 20 C.F.R. § 416.902 ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.")

As for Dr. Ayub, he only saw Shewmake on a few occasions, and nothing in the record suggests they had an "ongoing" relationship. (See A.R. 396-97, 556.) The regulations state that an ongoing treatment relationship generally means that a claimant sees or has seen the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." 20 C.F.R. § 404.1502. While seeing a doctor only a couple of times a year can constitute a treating relationship if the patient "*intends to keep visiting the physician on an ongoing basis*," *Lewis v. Comm'r of Soc. Sec.*, No. 12 CV 241, 2013 WL 4670202, at *4 (N.D. Ind. Aug. 30, 2013) (emphasis in original and citations omitted), the record does not show Shewmake intended to continue visiting Dr. Ayub. After a visit in 2009 and two visits in 2010, Shewmake did not see Dr. Ayub again and instead sought treatment from Dr. Bhargava, another gastroenterologist, who he visited on at least eight occasions in 2010 and 2011. (See, e.g., id. at 603, 621, 651, 671-73, 756, 785.) This treatment history is

consistent with finding that Shewmake did not have an ongoing relationship with Dr. Ayub.

Accordingly, Dr. Shah's and Dr. Ayub's opinions were not entitled to controlling weight, and the ALJ could determine how much weight to give them based on how well-supported and explained the opinions were, whether they were consistent with the record, whether Drs. Shah and Ayub were specialists in Shewmake's disorders, and any other factors of which the ALJ was aware. *See* 20 C.F.R. § 404.1527(d)(3)-(6); *White*, 415 F.3d at 658.

The ALJ properly used these factors to discount Dr. Shah's and Dr. Ayub's opinions. The ALJ concluded that Dr. Shah's MSS was not supported by the record and was inconsistent with NP Hushaw's notes indicating Shewmake's Crohn's symptoms stabilized for long stretches at a time. (A.R. 43.) The ALJ further explained that Dr. Shah's opinion was contradicted by Drs. Reau and Bhargava, gastrointestinal specialists, who characterized Shewmake's Crohn's disease as mild and "quiescent." (Id.) As for Dr. Ayub, the ALJ decided for similar reasons that his cursory note stating Shewmake "requires frequent episodes to the bathroom" lacked objective support in the record. (Id.) The ALJ also cited to "the nature and extent of the treatment record" as part of the reason why she discounted Dr. Ayub's opinion. (Id.) The record shows that Dr. Ayub saw Shewmake on only a few occasions, and there is no evidence that Dr. Ayub acquired extensive knowledge of Shewmake's impairments. Given the above, this court finds that the ALJ gave sufficient reasons for rejecting the opinions of Drs. Shah and Ayub.

Regarding NP Hushaw, as the ALJ correctly pointed out, a nurse-practitioner is not an "acceptable treating source." (A.R. 43); *see* 20 C.F.R. § 416.913(d)(1) (listing nurse-practitioner among occupations that are not "acceptable medical sources"). Only acceptable medical sources may give medical opinions "that reflect judgments about the nature and severity of [the claimant's] impairment(s)," including symptoms, diagnoses and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ may still consider a nurse-practitioner's opinions, but the weight they will be given will depend on a number of factors, including the degree to which they are supported by objective evidence. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

The ALJ concluded that there was "little support for [NP Hushaw's] conclusions in the record" because her own treatment notes were inconsistent with what she reported in her Functional Capacity Questionnaire and MSS. (Id. at 43.) Specifically, the ALJ found that NP Hushaw's notes "describe[d] [Shewmake's] disease process as 'mild' and more importantly fail[ed] to reflect reports of significant symptoms or complaints from the claimant." (Id.)

The record supports the ALJ's finding. NP Hushaw opined that Shewmake was "[i]ncapable of even low stress jobs" due to frequent flare-ups and hospitalization, that he would need to take eight unscheduled breaks to rest throughout the day, and that he could not work an eight-hour workday. (Id. at 628-33.) She further concluded that Shewmake would miss more than four days of work

per month due to his impairments.  (Id. at 630.)  However, the record shows that Shewmake only had three flare-ups requiring hospitalization over a period of two years.  (Id. at 621.)  For several months Shewmake denied having or made no mention of diarrhea during visits to PCJ.  (Id. at 679, 683, 685, 689, 695, 697, 701, 704, 707.)  It is unclear on what basis NP Hushaw opined that Shewmake would need as many as eight unscheduled breaks during an average workday.  Finally, the ALJ noted that NP Hushaw's opinions were inconsistent with evaluations done by Shewmake's gastroenterologists.  (Id.)  Accordingly, the court is satisfied that the ALJ complied with regulatory guidelines in discounting NP Hushaw's opinions.

Ultimately remand is still necessary because the ALJ's flawed credibility assessment cannot be deemed harmless.  An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding.  *Pierce*, 739 F.3d at 1051 (citing *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006)).  Neither of those conditions applies here, and the court cannot say with certainty that the ALJ would have reached the same conclusion about Shewmake's credibility despite her errors.  *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).  In reviewing her credibility determination on remand, the ALJ should also address the gaps identified by this court in Shewmake's RFC assessment.

## Conclusion

For the foregoing reasons, Shewmake's motion for summary judgment is granted to the extent that the case is remanded for further proceedings and the Commissioner's motion is denied.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**